**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **No. 1:21-cr-00257-RDM** |
| **RONNIE B. PRESLEY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum. For the reasons set forth herein, the government requests that this Court sentence defendant Ronnie B. Presley, for the sole count of conviction, to a term of incarceration of 16 months, the upper end of the applicable range under the U.S. Sentencing Guidelines (USSG or the Guidelines), followed by one year of supervised release; and order him to pay $2000 in restitution and the mandatory $100 special assessment. Because Presley has already served 17 months in custody in this case but has been released since August of this year, a sentence of 16 months' incarceration would be a time-served sentence.

## I.     INTRODUCTION

Presley participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to

Presley, who was on probation for a 2019 assault conviction, joined the storming of the police line on the West Terrace of the Capitol Building, and unlawfully entered the Capitol at approximately 2:35 p.m. through a doorway on the Upper West Terrace.  He then proceeded with dozens of other rioters into the Rotunda.  He was still in the Rotunda approximately 20 minutes later when multiple police officers entered the room and attempted to clear it of rioters.  Presley would not comply with police commands to leave the room, and physically resisted, such that officers had to push him away from them and toward an exit.  When he eventually did leave the Capitol, at approximately 3:35 p.m., he remained immediately outside the doorway, along with multiple other rioters.  When police officers attempted to clear that area, Presley again physically resisted, pulling on one of the officers' riot shields.

The government recommends that the Court sentence Presley to 16 months of incarceration, which is the top end of the advisory U.S. Sentencing Guidelines range of 10 to 16 months.  Such a sentence reflects the gravity of Presley's conduct and his significant prior criminal history.[2]

---

the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] Following his arrest in this case, the defendant was ordered detained on March 8, 2021. After pleading guilty pursuant to a plea agreement (discussed *infra*), he was released on his own recognizance on August 4, 2022.  He therefore served a total of 17 months and 7 days in pre-sentencing confinement.  Both parties miscalculated his criminal history score in the plea agreement and believed the applicable range of incarceration, under the Guidelines, would be 18 to 24 months.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Presley among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.  Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.  Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Presley's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol.  Members of the House of Representatives and the Senate were meeting in separate chambers to certify the Electoral College vote count for the 2020 presidential election.  By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S.

Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.  At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.  Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers.  All proceedings, including the joint session, were effectively suspended.  The proceedings eventually resumed at approximately 8:00 p.m., after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The Court of Appeals for the D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy."  *United States v. Munchel*, 451 U.S. App. D.C. 294, 305, 991 F.3d 1273, 1284 (2021).  Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."  *United States v. Cua*,

No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.  This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than one hundred police officers.  *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack:  A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).  Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers.  *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety.  *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-

05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.  They caused extensive, and in some instances, incalculable, losses.  This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.  *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).  The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

## B.    Defendant's Role in the January 6, 2021 Attack on the Capitol

### *Presley's Approach to the Capitol and Entry into the Rotunda*

Presley, a convicted felon who was still on probation on January 6, 2021 for an assault conviction, approached the Capitol that day from the west.  From the thousands of video recordings related to the riot that have been gathered in the investigation—from social media, forensic smart-phone searches, security cameras, and police body-worn-cameras—the first known appearance of Presley is on a short social media video recording from approximately 2:30 p.m.  In that video he is among a large group of rioters massed on the northern end of the Lower West Terrace, near the scaffolding set up for the upcoming inauguration.  Image 1, below, is a

6

still photo from that video.



Image 1

At this moment in the recording, which includes audio, another rioter has just stated, "The stands is where we need to go," likely referring to the viewing stands that had been erected in anticipation of the inauguration.  Presley responded:  "Let's do it!"

Presley next appears in a separate social media recording that captures him standing on the Upper West Terrace, a few minutes later.  In that recording, Presley proudly proclaims, "I stand on the top steps of the Capitol!"  Image 2, below, is a still photograph from that recording.



Image 2

Presley entered the Capitol shortly thereafter, at 2:35 p.m., through the Upper West Terrace (UWT) door.  Significantly, this was merely 15 minutes after the initial breach of the building and only two minutes after that particular door was breached.

The UWT door is indicated on the map of the Capitol that appears below.



Presley's entrance was recorded by a security camera inside the doorway.  Image 3, below, is a still photo from the recording, showing Presley entering the Capitol.



Image 3

As Presley then proceeded through the short corridor, towards an interior doorway that opened to a set of stairs, he turned toward another rioter who was recording the scene.  In that video, Presley--clearly realizing and desiring that he would be recorded and perhaps even live-streamed--looked directly into the other rioter's camera and yelled, "Fight for this!"  A still image from that video appears below.



Image 4

The same recording then shows Presley and other rioters walking up the stairs and into the Rotunda.  Image 5, below, is a still image from about 20 seconds later in the same recording, that shows Presley as he reaches the top step and is about to proceed into the Rotunda.



Image 5

***Presley's Conduct in the Rotunda***

For the first 25 minutes after Presley was in the Rotunda, nothing remarkable occurred in the room.  However, at around 3:02 p.m., dozens of additional uniformed Metropolitan Police Department (MPD) and U.S. Capitol Police (USCP) officers entered to begin the process of

clearing it of rioters.  As the officers directed the rioters toward the exit on the east side of the room, many rioters, including Presley, resisted, resulting in scuffles between rioters and officers.

The MPD officers involved were wearing body-worn cameras (BWCs) that recorded these scuffles.  Image 6, below, is a screen shot from a BWC recording paused at 3:06:30 p.m., Presley is in the process of moving toward an officer who has just directed him to leave the room.



Image 6

Over the next 25 seconds, that officer had to push Presley away three times, because after each push Presley moved back toward the officer.

About one minute later, a second officer is forced to engage with Presley because he still was not moving toward the exit.  Image 7, below, is a screen shot from a BWC recording paused at 3:07:59 p.m., the officer is pushing his baton against Presley's torso, because Presley has just

moved toward the officer.



Image 7

This BWC recording shows that the officer pushed Presley a total of seven times in 20 seconds because, again, after each push Presley continued to move toward the officer.

When that officer was forced to turn his attention to a different rioter, Presley continued to hold his ground until a third officer engaged with him. Image 8, below, is a screen shot from a BWC paused at 3:09:07 p.m. It shows Presley behind two other rioters who moments before had announced to the officers that they were not going to leave the room.



Image 8

Over the next 30 seconds, Presley continued to move toward the officer, forcing the officer to

deploy his baton to push Presley away, as shown in Image 9, below.



Image 9

14

***Presley Exits the Rotunda and the Capitol***

Eventually, at approximately 3:14 p.m., after an officer was required to use a chemical irritant against him, Presley moved out of the Rotunda and into a short hallway leading to the East Rotunda Doors, as seen in Image 10, below, a screen shot from security-camera footage.



Image 10

As can be seen in Image 10, Presley is among the last group of rioters to leave the Rotunda, as nearly all the persons behind him are police officers.

15

Presley then exited through the East Rotunda Doors, and onto the East Terrace, at approximately 3:18 p.m.  Image 11, below, also from a USCP security camera, shows Presley as he is leaving the building.



Image 11

**Presley's Conduct Outside the East Rotunda Doors**

Rather than move away from the doorway and leave the Capitol grounds, Presley remained positioned close by the Capitol building for a significant amount of time.  Image 12, below, from a security camera recording paused at 3:39 p.m.—more than 20 minutes later— shows Presley angrily gesturing toward persons who are still in the building.



Image 12

Approximately two minutes later, Presley was still positioned near the East Rotunda doorway as officers inside struggle to prevent the doorway from being breached again.  In Image 13, below, a screen shot from a security camera recording paused at 3:43 p.m., officers are spraying irritant at the rioters outside and two officers have deployed their riot shields.  The arrows point to the top edges of the two riot shields.



Image 13

Moments later a rioter outside the doorway, who is behind the right side of the doorway and concealed from the camera, pulls down on the top edge of the riot shield on the right, as shown in Image 14, below.



Image 14

The same moment was captured in an image, taken from the other side of the doorway, that was posted on social media. Image 15, below, and reveals that Presley was the rioter who was pulling on the shield.



Image 15

Shortly thereafter, Presley, still on the Capitol grounds, spoke to another rioter who recorded their brief conversation.  In the recording, which was obtained from social media, Presley proudly states:

> Hey, ya'all watch the videos.  Watch the videos you pull up.  I'm the guy that got you in this building.  Watch the videos.  Take my word for it.

As he referred to "this building," Presley emphatically pointed toward the Capitol.  That moment in the recording is shown in Image 16, below.



Image 16

### III.    THE CHARGES AND PLEA AGREEMENT

On November 10, 2021, a grand jury returned a superseding indictment charging Presley with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), Impeding Passage Through the Capitol Grounds and Buildings in violation of 40 U.S.C. § 5104(e)(2)(E), and

21

Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C.

§ 5104(e)(2)(G).

On July 28, 2022, pursuant to a plea agreement, Presley pled guilty to Count One, Civil

Disorder, in violation of 18 U.S.C. § 231(a)(3).  He now faces sentencing for that offense.

## IV.     STATUTORY PENALTIES

As noted by the plea agreement, Presley faces up to 5 years of imprisonment, a fine up to

$250,000, and a term of supervised release of not more than three years.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines

should be the starting point and the initial benchmark" for determining a defendant's sentence.

*Id.* at 49.  The United States Sentencing Guidelines ("USSG" or "Guidelines") are "the product

of careful study based on extensive empirical evidence derived from the review of thousands of

individual sentencing decisions" and are the "starting point and the initial benchmark" for

sentencing.  *Id.* at 49.

As both parties and the Probation Office agree, the Guidelines analysis with respect to

Presley's offense of conviction is as follows:

| | |
|---|---|
| Base Offense Level<br>USSG § 2A2.4(a) (obstructing or impeding officers) | 10 |
| Specific Offense Characteristic<br>USSG § 2A2.4(b)(1)(A) (the offense involved physical contact) | +3 |
| Total | 13 |

USSG §3E1.1 (Acceptance of responsibility)                    -2

     Total Adjusted Offense Level:                    11

The U.S. Probation Office has calculated that Presley has three criminal history points, placing him in Criminal History Category II.  Presentence Investigation Report (PSR) ¶ 49. Although this scoring is different from what the parties set forth in the plea agreement, *see supra* note 1, the Government does not object to that determination.  Notably, however, Presley was convicted of burglary in 1997, sentenced to two years imprisonment, released to probation, and had his probation repeatedly revoked, *id.* ¶ 43; was convicted of DUI in 2001, *id.* ¶ 44; and was convicted for domestic assault in 2005, *id.* ¶ 45, none of which counts towards his criminal history score.

With a Total Adjusted Offense Level of 11, and a Criminal History Category of II, Presley's Guidelines imprisonment range is 10 to 16 months and his Guidelines fine range is $4000 to $40,000.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  Some of the factors this Court must consider include:  the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, *id.* § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, *id.* § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, *id.* § 3553(a)(6).  In this case, as described below, all of the Section 3553(a) factors weigh in favor of a term of incarceration at the top of the Guidelines range.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who entered the Capitol  on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.  As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Presley's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include:  (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.  While these factors are not

exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a term of incarceration. Presley forced his way toward an access point into the Capitol building and then reveled in his achievement ("I stand on the top steps of the Capitol!"). He then in separate encounters physically resisted three police officers who tried to remove him from the Rotunda. When he finally exited the Capitol, he remained near an access point and again physically interfered with police. And finally, when given an opportunity, he bragged to other rioters as to his role in the attack ("I'm the guy that got you in this building.")

### B. Presley's History and Characteristics

As noted above, Presley has a significant criminal history, most of which does not count towards his criminal history category. He also has a 2020 conviction for domestic assault which resulted in a suspended prison sentence. PSR ¶ 46. He was on probation for the assault conviction when he participated in the attack on the Capitol. *Id.* ¶ 48.

Presley's criminal conduct on January 6, 2021 was not an isolated event in an otherwise law-abiding life.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process." Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15,

2021) (hereinafter "FBI Director Wray's Statement"), available at

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

As with the nature and circumstances of the offense, this factor supports a sentence of

incarceration.  When Presley entered the Capitol grounds and then the Capitol itself, it was

abundantly clear to him that lawmakers, and the police officers that protect them, were under

siege.  Police officers were overwhelmed, outnumbered, and in some cases, in serious danger.

The rule of law was not only disrespected; it was under attack that day.  A sentence less than the

maximum available Guidelines sentence could encourage further abuses.  *See Gall*, 552 U.S. at

54 (It is a "legitimate concern that a lenient sentence for a serious offense threatens to promote

disrespect for the law.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals:  general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant.  *United States v. Russell*, 390 U.S. App. D.C. 100, 106, 600 F.3d 631, 637 (2010); 18

U.S.C. § 3553(a)(2)(B), (C).

### *General Deterrence*

A sentence of incarceration is needed "to afford adequate deterrence to criminal conduct"

by others.  18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases

involving domestic terrorism, which the breach of the Capitol certainly was.  *See id.* § 2331(5)

(defining "'domestic terrorism'").  The demands of general deterrence weigh strongly in favor of

incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  The

violence at the Capitol on January 6, 2021 was cultivated to interfere, and did interfere, with one

of the most important democratic processes we have: the transfer of power.  As noted by this

court during sentencing in *United States v. Paul Hodgkins*, 1:21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed.  When a
> mob is prepared to attack the Capitol to prevent our elected
> officials from both parties from performing their constitutional and
> statutory duty, democracy is in trouble.  The damage that
> [Hodgkins] and others caused that day goes way beyond the
> several-hour delay in the certification.  It is a damage that will
> persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was

seven months ago for the United States and our diplomats to convince other nations to pursue

democracy.  It means that it will be harder for all of us to convince our children and our

grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See id.* at 46

("I don't think that any plausible argument can be made defending what happened in the Capitol

on January 6th as the exercise of First Amendment rights.").  And it is important to convey to

future rioters and would-be mob participants—especially those who intend to improperly

influence the democratic process—that their actions will have consequences.  There is possibly

no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also

weighs heavily in favor of a term of incarceration.  First, although Presley has a criminal history

category of II, his history shows a clear pattern of committing new offenses while on probation

or otherwise failing to comply with the terms of his probation.  PSR ¶¶ 43-46.  Second, during

the course of his criminal conduct on January 6, 2021, which occurred while he was on probation

for an assault conviction, he pridefully boasted as to what he had done.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v.*

*United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has

"'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding

inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United*

*States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the

capacity courts lack to 'base its determinations on empirical data and national experience, guided

by professional staff with appropriate expertise,'" and "to formulate and constantly refine

national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101.  As the Court of Appeals for the Third

Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data.  U.S.S.G. §1A1.1, intro., comment 3.  More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process.  *See* 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.  In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.  Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Presley and others like him committed on January 6 are unprecedented.  These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases.  To try to mechanically compare Presley to other defendants convicted of violating 18 U.S.C. § 231(a)(3) prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.  Accordingly, the far more apt comparison

is between Presley and other defendants whose criminal conduct relating to the riot has similarly resulted in a conviction solely for that offense.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *cf. United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("a Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough v. United States*, 552 U.S. 85, 91 (2007)).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[3]If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

To date, twenty Capitol riot defendants including Presley have been convicted solely on one count of violating 18 U.S.C. § 231, all pursuant to plea agreements.  Of those twenty cases, eleven have proceeded to sentencing.  In those eleven cases, the applicable Guidelines range of imprisonment, and the sentences of imprisonment imposed, are set out here:

| | | |
|---|---|---|
| *United States v. David Blair*, 1:21-cr-00186-CRC | 18 – 24 months | 5 months |
| *United States v. Jerry Ryals*, 1:21-cr-00244-CKK-1 | 0 – 6 months | 9 months |
| *United States v. Christian Cortez*, 1:21-cr-00317-TSC-2 | 0 – 6 months | 120 days |
| *United States v. Derrick Evans*, 1:21-cr-00337-RCL | 0 – 6 months | 3 months |
| *United States v. Daryl Johnson*, 1:21-cr-00407-DLF-1 | 0 – 6 months | 30 days |
| *United States v. Daniel Johnson*, 1:21-cr-00407-DLF-2 | 0 – 6 months | 4 months |
| *United States v. Andrew Griswold*, 1:21-cr-00459-CRC | 0 – 6 months | 75 days |
| *United States v. Robert Fairchild*, 1:21-cr-00551-TFH | 8 – 14 months | 6 months |
| *United States v. Moises Romero*, 1:21-cr-00677-TSC | 8 – 14 months | 12 months and 1 day |
| *United States v. Thomas Hamner*, 1:21-cr-00689-ABJ | 70 – 87 months | 30 months |
| *United States v. Nolan Cooke*, 1:22-cr-00052-RCL | 8 – 14 months | 12 months and 1 day |

As the table shows, there are three other Capitol riot defendants convicted and sentenced for only a Section 231(a)(3) violation whose Guidelines ranges overlap with Presley's range of 10 to 16 months.  In all three of those cases, *Robert Fairchild*, *Moises Romero* and *Nolan Cooke*, the applicable range was 8 to 14 months.  In two of them, *Moises Romer* and *Nolan Cooke*, the courts imposed a sentence within the range (12 months and a day); and in one of them, *Robert Fairchild*, the court imposed a sentence (6 months) below the range.  There is also a fourth case,

*David Blair*, where the defendant faced a range (18 – 24 months) higher than Presley's where the court imposed a sentence (5 months) that was below the lower end of Presley's range.  In all but one of the remaining cases the common Guidelines range (0 to 6 months) was below Presley's and in each of those the court imposed a sentence within the range.  In the remaining case (*Thomas Hamner*) the defendant faced a higher range (70 to 87 months) than Presley does, and although the court sentenced the defendant below the range, the sentence (30 months) was still well above the upper end of Presley's range.

Accordingly, the *Robert Fairchild*, *Moises Romero*, *Nolan Cooke* and *David Blair* cases are the most comparable to Presley's case.  In each of these cases there are distinctions that justify this Court imposing a higher sentence for Presley.

## The *David Blair* case

Defendant David Blair did not arrive on the Capitol grounds until approximately 5:35 p.m., well after police had cleared the building, and he never unlawfully entered the building. While on the grounds, he physically interfered with only one officer.  After being subdued by that officer, Blair was immediately apologetic and contrite, and cooperated in the subsequent investigation against him.  Moreover, prior to the riot, Blair had never been charged with a crime or even arrested.

## The *Robert Fairchild* case

Defendant Robert Fairchild was unlawfully on the Capitol grounds for two hours, during which he moved barriers set up to protect the grounds and pushed multiple police officers trying to protect the building.  Although he did enter the building, he was only inside for 17 minutes.

Most notably, Fairchild is a decorated Marine who saw combat and suffered injuries during the Iraq War.  In imposing a sentence of 6 months, the court specifically invoked the Guidelines provision authorizing a downward departure for military service.  *See* USSG 5H1.11.

### The *Moises Romero* case

Defendant Moises Romero was unlawfully on the Capitol grounds for approximately an hour before physically forcing his way into the building with other rioters.  In doing so, Romero made physical contact with one other officer.  He remained in the building for only 15 minutes.

### The *Nolan Cooke* case

Defendant Nolan Cooke repeatedly and physically engaged with police officers protecting the Capitol building.  Although he attempted to enter the building, he was ultimately not able to do so.

*          *          *

The government submits that a sentence of 16 months in prison for Presley would not result in sentencing disparity with respect to the most comparable cases, i.e., those involving defendants David Blair, Robert Fairchild, Moises Romero and Nolan Cooke, because Presley's conduct was more egregious or because of differences in the background and criminal history of those defendants.

As set out above, Presley, a convicted felon on probation on an assault charge, forced his way onto the UWT and into the Capitol building, entering the building only 15 minutes after the initial breach through an entrance breached only two minutes earlier.  As he made his way onto the UWT he encouraged his fellow rioters ("Let's do it!") and did so again upon entering the building itself ("Fight for this!").  Thereafter, while in the building he defiantly refused to leave

and physically interfered with officers on three distinct occasions.  When he finally left the building, after being inside for 60 minutes, he remained immediately outside a doorway for at least 20 more minutes and, again, physically resisted an officer attempting to clear the area. Shortly thereafter, he openly boasted about his accomplishment ("I'm the guy that got you in this building.").

In sum, Presley's case is distinguishable from these four cases, and deserving of a more serious sentence, due to his more significant prior criminal history, his lack of prior military service, and the fact that he entered the Capitol and was inside for a far greater length of time.

**RESTITUTION**

The Victim and Witness Protection Act of 1982 (VWPA), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[4]  *United States v. Papagno*, 395 U.S. App. D.C. 82, 85, 639 F.3d 1093, 1096 (2011).  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, *id.* § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to

---

[4]The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 395 U.S. App. D.C. at 85, 639 F.3d at 1096, does not apply here.  *See* 18 U.S.C. § 3663A(c)(1).

by the parties in a plea agreement." *Id.* § 3663(a)(3); *accord United States v. Anderson*, 383 U.S. App. D.C. 381, 387-88, 545 F.3d 1072, 1078-79 (2008).

Those principles have straightforward application here. The victims in this case, i.e., the officers Presley interfered with, did not suffer bodily injury as a result of Presley's conduct. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Presley must pay $2000 in restitution to the Architect of the Capitol, which reflects in part the role Presley played in the riot on January 6, 2021.[5]   Plea Agreement (ECF no. 40) § 12. At the time of the plea agreement, the riot at the United States Capitol was estimated to have caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* As discussed above, that estimate has since increased.

### B.   FINE

Presley's conviction subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3).

The government submits that a fine is not appropriate in this case.

### CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 16 months, followed by a three-year period of supervised release, and order Presley to pay $2000 in restitution and the mandatory $100 special assessment.

---

[5]Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* USSG § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

by:      /s/*Michael C. Liebman*
Michael C. Liebman
Assistant United States Attorney
D.C. Bar no. 479562
601 D Street, N.W., room 4-1501
Washington, D.C.  20530
(202) 252-7243
michael.liebman@usdoj.gov